UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

NATHAN W. LEAR, )
)
)
Plaintiff, )
)
v. ) No. 2:14-cv-00307
)
COMMISSIONER of SOCIAL SECURITY )
)
)
Defendant. )

## OPINION AND ORDER

An administrative law judge denied Nathan Lear's application for Social Security disability insurance benefits. Lear appeals, claiming, among other things, that the ALJ erred by failing to provide adequate reasons for rejecting the opinions of examining state agency physicians. Because I agree that the ALJ did not support his decision to discount the opinions of the examining state agency physicians with substantial evidence, I will remand on that issue.

## BACKGROUND

Lear was hit by a car while riding his bike in 1996. [DE 16 at 2-3.] He was 12 years old. [*Id*.] After the accident, Lear underwent physical therapy, primarily working on issues related to walking, the use of his right arm and hand, speech therapy, and memory. [*See generally* R. 213-303.] From the time Lear was discharged from physical

therapy in 1997 until he filed his social security claim in 2011, there seems to have been no medical treatment to speak of. [R. 28.]

During that time, Lear graduated high school with a grade point average of 2.33 and a class rank of 149/253. [R. 206.] Lear's high school transcripts do not indicate he was in special education classes. [*Id.*] However, Lear claims he did receive accommodations in high school, including extra time on tests and reading and writing assignments. [DE 16 at 12.] His educational records also show that Lear required three tries before he was able to pass the English/language arts portion of the ISTEP+ test. [R. 208.]

Lear's work history is short, consisting of only three short-term jobs. For several months in 2004 and 2005, he worked at a local grocery store. [R. 209.] At his hearing in front of the ALJ, Lear testified that he started stocking shelves but was demoted to bagging groceries because he performed the job too slowly. [R. 56.] Lear was eventually fired from his job at the grocery store for using profanity at a coworker who he states was laughing at and sticking her tongue out at him. [R. 51.] After being fired, Lear worked as a dishwasher at a KFC for a brief period of time in 2005. [R. 46-47.] Lear testified at his hearing that he did not perform this job "quick enough," and so received very few hours. [R. 59.] This caused him to quit, though the record does not show how long he worked there. [*Id.*] Lear reported one additional job as a stocker in a fireworks factory beginning and ending in 2007, though exactly how long he worked there is not in the record. [R. 145.]

Lear filed his social security claim in January 2011. [R. 72.] On February 17, 2011, Lear was examined by Dr. Mutena Korman at the request of the Social Security Administration (SSA). [R. 308-312.] Dr. Korman is a medical doctor of internal medicine. [R. 308.] Dr. Korman found that Lear's musculo-skeletal system was within normal limits, that Lear could easily open a jar, zip and unzip a zipper, button and unbutton his clothing, and that he had normal gripping strength in both hands. [R. 310.] Dr. Korman also noted that Lear had slurred speech and limited memory at the time of the examination, as well as limited range of motion in his spine and lower extremities. [R. 309-311.] Dr. Korman concluded his examination with the following impression: "Mr. Lear is a 26 year old patient with a history of poor cognitive skills, traumatic brain injury associated with right leg (fasciotomy). Due to present cognitive functions he is unable to perform in a normal working environment." [R. 311.]

On February 18, 2011, Lear was given a psychological examination by Dr. John T. Heroldt, a Disability Determination Services (DDS) psychological consultant. [R. 313-318.] Dr. Heroldt diagnosed Lear with a "Personality Change" due to motor vehicle accident. [R. 316.] During the examination, Lear stated that he suffered from anger problems, and that he got "stressed out." [R. 313.] Lear stated the problems began after he sustained his head injury. [*Id.*] Lear described his daily activities by telling Dr. Heroldt that he helps his aunt take care of her animals and clean up around her house. [R. 316.] Lear also stated that he is physically capable of driving himself. [*Id.*] Dr. Heroldt found that Lear was oriented to time and place, easily engaged, had no

3

looseness of thought, and did not present with any psychotic symptoms. [R. 314-316.] When tested, Lear was able to do some simple math problems, but was unable to do others. [R. 315-316.] Dr. Heroldt noted that Lear spoke in a "slow, deliberate, and staccato-like" fashion. [R. 316.] He also noted Lear had below average cognitive capacity, had below average memory, was incapable of correctly naming four U.S. Presidents since 1950, and was incapable of handling his funds. [R. 315-316.] Dr. Heroldt further diagnosed Lear as having "[o]ccupational problems" and gave Lear a global assessment functioning (GAF) score of 45. [R. 316.] A GAF score of 45 indicates "serious impairments in social, occupational or school functioning." [R. 29.]

Following Dr. Heroldt's examination, Dr. Kari Kennedy, a state psychological non-examining consultant, reviewed Lear's mental health record and made a number of findings about Lear's abilities. [R. 319-336.] In part, she found that Lear is: mildly limited in his ability to perform daily living activities; moderately limited in maintaining social functioning; moderately limited in maintaining concentration, persistence, or pace; moderately limited in his ability to understand, remember, and carry out detailed instructions; moderately limited in his ability to maintain attention and concentration for extended periods; moderately limited in his ability to interact appropriately with the general public; and moderately limited in his ability to respond appropriately to changes in his work setting. [R. 329, 333-334.] Dr. Kennedy concluded the following about Lear:

4

> "(He) is able to: understand, carry out and remember simple instructions; able to make judgments commensurate with functions of unskilled work; able to respond appropriately to brief supervision and interactions with coworkers and work situations; able to deal with changes in a routine work setting."

[R.335.] Dr. Kennedy also indicated that the GAF score Dr. Heroldt assigned Lear "appears low given MSE [mental status examination] and ADLs [activities of daily living]." [R. 335.] A second non-examining state psychological consultant later affirmed Dr. Kennedy's opinion. [R. 356.]

Dr. J.V. Corcoran, a non-examining medical consultant reviewed Lear's medical records and made a number of findings about Lear's physical capabilities. [R. 338-345.] Dr. Corcoran determined that Lear could occasionally lift 20 pounds, balance, stoop, kneel, crouch, crawl, and climb ramps or stairs. [R. 340.] Dr. Corcoran also determined that Lear should never climb a rope, ladder, or scaffolding, nor should he have moderate exposure to hazardous conditions or unprotected heights. [R. 340, 342.] A second non-examining medical consultant later affirmed Dr. Corcoran's assessment. [R. 358.]

In the ALJ's opinion, he found that Lear had severe impairments in the form of residuals from a motor vehicle accident, residuals from a traumatic brain injury and status post right tibia fracture. [R. 24.] Despite this, the ALJ found that Lear had a residual functional capacity that rendered him capable of performing light work with exceptions, and that such work exists in "significant numbers in the national economy." [R. 32-33.]

5

**DISCUSSION**

If an ALJ's findings are supported by "substantial evidence," then they must be sustained. *See* 42 U.S.C. § 405(g). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Review of the ALJ's findings is deferential. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). But in making his findings, an ALJ must build a logical bridge from the evidence to the conclusion. *Grooves v. Apfel,* 148 F.3d 809, 811 (7th Cir. 1998). That bridge must be sufficiently developed to allow me to assess the validity of the ALJ's findings. *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). An ALJ may not "cherry-pick" from the medical record in order to support a denial of benefits. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). An ALJ also may not substitute his own judgment for that of a medical professional, or make medical conclusions about a claimant's illness, without relying on medical evidence. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

In general, and for what should be obvious reasons, examining physicians are afforded more weight than non-examining physicians. 20 C.F.R. § 404.1527(d)(1); *Minnick v. Colvin*, 775 F.3d 929, 937-938 (7th Cir. 2015). But even so, the ALJ isn't required to blindly accept the agency's examining physician's opinion in the face of compelling evidence to the contrary. *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014). It is unusual, however, for an ALJ to reject an examining SSA doctor's opinion

6

because doctors hired by the agency are unlikely to be biased toward claimants the way treating physicians may be, and they are unlikely to exaggerate a claimant's disabilities. *Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013); *Beardsley*, 758 F.3d at 839. So when an ALJ *does* outright reject or even discount an examining SSA doctor's opinion, he must provide a good explanation for doing so. *Beardsley*, 758 F.3d at 839.

Throughout his decision, the ALJ runs through each physician's findings and opinions, and then indicates how much weight he gives each one. It should be noted that each of the physicians weighed was a state agency physician. Two were examining physicians (Dr. Korman and Dr. Heroldt) and two were not (Dr. Kennedy and Dr. Cocoran). The ALJ assigned Dr. Korman's finding that Lear was unable to perform work in a normal working environment "no weight." [R. 29.] In doing so, the ALJ noted that Dr. Korman is a medical doctor, and not a psychologist, and thus was not qualified to make such a finding. [*Id.*] At the hearing, the ALJ expressed uncertainty about how Dr. Korman reached his decision: "I don't know why this doctor feels he is qualified to make such a conclusion. I'm not sure what findings he based this conclusion on and I'm not sure what evidence elsewhere in the record would support these conclusions." [R. 43.]

Regarding Dr. Korman's qualifications, I'm not sure why he's not qualified to opine as to Lear's cognitive functioning. Dr. Korman is a medical doctor of internal medicine, and a primary care physician. [R. 308, DE 16 at 11.] Generally speaking, residents of family medicine receive training in cognitive functioning and are capable of

7

diagnosing and treating mental dysfunction. *See* Accreditation Council for Graduate Education, "ACGME Program Requirements for Graduate Medical Education in Family Medicine," http://www.acgme.org/Portals/0/PFAssets/ProgramRequirements/ 120_family_medicine_07012015.pdf, at pgs. 7, 12, 19 (last visited Mar. 24, 2016). The ALJ is correct, however, that there's not a lot of explanation as to what Dr. Korman based his conclusion on. There doesn't appear to be any specific cognitive testing done, so maybe it was based on Lear's medical records, or the results of some of the other testing, or even just Korman's general impression based on interacting with Lear during the course of the examination.

The real problem here is that if the ALJ was not sure about the basis on which Dr. Korman made the conclusion, he had a "duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004). When necessary, as it was here, the ALJ should contact the physician for additional information. *Id.* Failing to do so means the ALJ did not have the substantial evidence he needed to decide how much weight to assign Dr. Korman's opinion. It also means the ALJ did not establish the logical bridge necessary for me to meaningfully review his decision. Maybe Dr. Korman's conclusion is justified and maybe it's not, but the ALJ needed to do more to find out. This is particularly true when, as here, a state agency-appointed doctor reports that a claimant is not able to work. *Beardsley*, 758 F.3d at 839.

The ALJ is wrong, however, in stating that there wasn't any support in the record for Dr. Korman's conclusion that Lear couldn't work due to his impaired cognitive functioning. Although a doctor need not have "detailed notes" or the corroboration of other physicians in order for his medical opinion to be given weight, *Herrmann v. Colvin*, 772 F.3d 1110, 1111 (7th Cir. 2014), Korman's opinion *is in fact* corroborated by Dr. Heroldt's low GAF score. A "GAF" score is a tool psychologists use to evaluate a patient's "global assessment of functioning." [DE 16 at 4.] Dr. Heroldt performed a psychological examination on Lear and assigned him a GAF of 45, which indicates serious impairment such as an inability to work. [R. 29; *See also* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, Text Revision 34 (4th ed. 2000).] A finding of such serious impairment supports Dr. Korman's opinion that Lear could not work in a normal working environment. The ALJ ultimately discounted Dr. Heroldt's GAF score, but that conclusion was not supported by substantial evidence, as discussed further below in connection with Dr. Heroldt's assessment.

The other reasons the ALJ offers for discounting Dr. Korman's opinion are no better. In support of his decision to afford Dr. Korman's opinion no weight, the ALJ states that Dr. Korman's findings are inconsistent with the "relatively normal" findings from Lear's psychological examination, the fact that Lear graduated from high school, and the fact that Lear had worked since sustaining the injury. [R. 29.] But according to Lear, he needed significant accommodations to be able to graduate from high school – a point the ALJ doesn't mention at all. [DE 16 at 12; R. 59.] So I don't know if the ALJ

9

disbelieved Lear's claim that he received extra time, factored it into the equation when balanced against Dr. Korman's medical opinion, or forgot about it, but it seems to me that this should have been at least mentioned in order to build a logical bridge.

I am also unclear on how the ALJ determined that Lear's employment was inconsistent with Dr. Korman's medical opinion. In my mind, that evidence actually supports Dr. Korman's opinion. Lear was fired from the longest employment he has held, and the ALJ found he can no longer perform that type of work [R. 32], which seems consistent with Dr. Korman's testimony that Lear is "unable to perform in a normal working environment" [R. 311]. Although it is not my place to reweigh evidence or substitute my judgment for the ALJ's, I simply cannot ignore that the main bases the ALJ provides for discounting Dr. Korman's conclusion that Lear can't work was not supported by substantial evidence. It's quite possible that conclusion is ultimately correct; but as the record currently stands, there's not enough there.

The ALJ also discounted the GAF score that Dr. Heroldt assigned Lear, declaring that he gave it "little weight." [R. 29.] But, as with his dismissal of Dr. Korman's opinion, his reasons for doing so were not supported by substantial evidence. The ALJ's proffered reasons for giving little weight to the GAF score were that the evidence showed only moderate impairments in the areas of social, occupational, or school functioning; Lear's psychological examination was "relatively normal;"and Lear has "shown himself to be self-sufficient with his care, and he drove himself to the (psychological) examination." [*Id.*]

10

Lear argues that the ALJ failed to establish a logical bridge between the psychological evaluation's findings and the ALJ's statement that the examination was "relatively normal." [DE 16 at 10.] I agree. The psychological examination record, in fact, shows a mixed bag. I have already summarized the results of the examination above; some results were indeed normal, but others were decidedly abnormal. And at the end of the evaluation, Dr. Heroldt assigned a score indicating serious impairments. The ALJ fails to explain, let alone support with substantial evidence, how he arrived at the conclusion that these findings were "relatively normal." To discount the opinion of an examining state agency psychologist, the ALJ needed to do more. *Beardsley*, 758 F.3d at 839.

Similar problems exist with the ALJ's determination that the psychological examination turned up only "moderate impairments," while the examining psychologist gave Lear a score indicating "serious impairments." [R. 29.] One explanation may be that the ALJ decided to discount the finding of "severe limitations" in favor of the "moderate impairments" findings of the non-examining physician, Dr. Kennedy. Generally, though, as noted above, greater weight is given to the opinion of an examining physician than is given to the opinion of a non-examining physician. 20 C.F.R. § 404.1527(c)(1); *Minnick*, 775 F.3d at 937-938. Here, the ALJ does not sufficiently explain his decision to do otherwise. Instead, he simply dismisses Dr. Heroldt's GAF score with the conclusory statement that the evidence showed "at most moderate impairments." [R. 29.] Then he accepts Dr. Kennedy's findings because they are

"consistent with the record." [R. 30.] But because Lear did not seek medical treatment for so long, the record in this case is basically limited to the findings and opinions of the state agency's doctors. And despite the ALJ's assertion otherwise, Kennedy's opinions are *not* wholly consistent with that record. The opinions of Dr. Korman and Dr. Heroldt are in conflict with Dr. Kennedy's. The ALJ was only able to declare such consistency after he discounted the opinions of the examining physicians—decisions which I have already shown were not supported by substantial evidence. This all strikes me as a classic case of "cherry-picking" that the Seventh Circuit has denounced time and time again. *See e.g. Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994).

In arriving at his decision, the ALJ also relied on the fact that Lear had no history of treatment for mental health problems. [R. 30.] But in order to weigh Lear's failure to receive medical health treatment or take medications, the ALJ was required to first inquire as to *why* Lear had not been receiving care. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). As Lear correctly points out, such a line of questioning did not occur here. [DE 16 at 9.] As such, the ALJ was not permitted to use Lear's lack of treatment against him.

The only remaining factors the ALJ cited for giving Dr. Heroldt's opinion little weight were the facts that Lear "drove himself to an appointment" and is capable of handling his own care. The former is insignificant; the latter is too vague to fully assess. In any event, this is not substantial enough evidence to rebut a trained physician's professional opinion. *See Spiva v. Astrue,* 628 F.3d 346, 352 (7th Cir. 2010) ("an ability to

engage in activities of daily living (with only mild limitations) need not translate into an ability to work full time."); *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) ("ability to struggle through the activities of daily living does not mean that she can manage the requirements of a modern workplace.").

At bottom, four agency doctors evaluated Lear or his medical records. The two who examined him determined that he can no longer work due to his cognitive impairments. The two non-examining physicians found he could still work. While an ALJ certainly can accept a non-examining physician's opinion over that of an examining physician, he must provide good reasons for doing so, particularly when the physicians he's discounting are state agency physicians. That didn't happen here and as such, the ALJ's conclusion that Lear is not disabled was not supported by substantial evidence.

## CONCLUSION

For the reasons stated above, this cause is **REMANDED** for further proceedings consistent with this order.

**SO ORDERED.**

ENTERED March 24, 2016.

s/ Philip P. Simon
CHIEF JUDGE

13